# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

MATTHEW SCIABACUCCHI, on behalf of himself and all others similarly situated,

    Plaintiff,

    v.

MATTHEW B. SALZBERG, JULIE M.B. BRADLEY, TRACY BRITT COOL, KENNETH A. FOX, ROBERT P. GOODMAN, GARY R. HIRSHBERG, BRIAN P. KELLEY, KATRINA LAKE, STEVEN ANDERSON, J. WILLIAM GURLEY, MARKA HANSEN, SHARON MCCOLLAM, ANTHONY WOOD, RAVI AHUJA, SHAWN CAROLAN, JEFFREY HASTINGS, ALAN HENDRICKS, NEIL HUNT, DANIEL LEFF, and RAY ROTHROCK,

    Defendants,

    and

BLUE APRON HOLDINGS, INC., STITCH FIX, INC., and ROKU, INC.,

    Nominal Defendants.

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

C.A. No. 2017-0931-JTL

## MEMORANDUM OPINION

Date Submitted: September 27, 2018
Date Decided: December 19, 2018

Kurt M. Heyman, Melissa N. Donimirski, HEYMAN ENERIO GATTUSO & HIRZEL LLP, Wilmington, Delaware; Jason M. Leviton, Joel A. Fleming, BLOCK & LEVITON LLP, Boston, Massachusetts; *Counsel for Plaintiff.*

William B. Chandler III, Randy J. Holland, Bradley D. Sorrels, Lindsay Kwoka Faccenda, WILSON SONSINI GOODRICH & ROSATI, P.C., Wilmington, Delaware; Boris Feldman, David J. Berger, WILSON SONSINI GOODRICH & ROSATI, P.C., Palo Alto, California; *Counsel for Defendants Katrina Lake, Steven Anderson, J. William Gurley, Marka Hansen, Sharon McCollam, Anthony Wood, Ravi Ahuja, Shawn Carolan, Jeffrey Hastings, Alan Hendricks, Neil Hunt, Daniel Leff, Ray Rothrock, and Nominal Defendants Stitch Fix, Inc. and Roku, Inc.*

Catherine G. Dearlove, Sarah T. Andrade, RICHARDS, LAYTON & FINGER, P.A., Wilmington, Delaware; Michael G. Bongiorno, WILMER CUTLER PICKERING HALE AND DORR LLP, New York, New York; Timothy J. Perla, WILMER CUTLER PICKERING HALE AND DORR LLP, Boston, Massachusetts; *Counsel for Defendants Matthew B. Salzberg, Julie M.B. Bradley, Tracy Britt Cool, Kenneth A. Fox, Robert P. Goodman, Gary R. Hirshberg, and Brian P. Kelley, and Nominal Defendant Blue Apron Holdings, Inc.*

**LASTER, V.C.**

The Securities Act of 1933 (the "1933 Act") bars any person from offering or selling securities except pursuant to a registration statement approved by the Securities and Exchange Commission (the "SEC") or in compliance with an exemption. The 1933 Act grants private rights of action to purchasers of securities so they can enforce its registration and disclosure requirements.

When Congress enacted the 1933 Act, it gave state and federal courts concurrent jurisdiction over claims by private plaintiffs and barred defendants from removing actions filed in state court to federal court. In 1998, Congress amended the 1933 Act in a manner that cast doubt on this jurisdictional allocation. In 2018, the Supreme Court of the United States held that state courts continue to have concurrent jurisdiction over claims by private plaintiffs and that defendants cannot remove actions filed in state court to federal court.[1]

Before their initial public offerings, the three nominal defendants adopted provisions in their certificates of incorporation that require any claim under the 1933 Act to be filed in federal court (the "Federal Forum Provisions"). Contrary to the federal regime, the provisions preclude a plaintiff from asserting a 1933 Act claim in state court.

This decision concludes that the Federal Forum Provisions are ineffective. In *Boilermakers*,[2] Chief Justice Strine held while serving on this court that a Delaware corporation can adopt a forum-selection bylaw for internal-affairs claims. In reaching this

---

[1] *Cyan, Inc. v. Beaver Cty. Empls. Ret. Fund*, 138 S. Ct. 1061 (2018).

[2] *Boilermakers Local 154 Ret. Fund v. Chevron Corp.*, 73 A.3d 934 (Del. Ch. 2013) (Strine, C.).

conclusion, he reasoned that Section 109(b) of the Delaware General Corporation Law (the "DGCL"), which specifies what subjects bylaws can address, authorizes the bylaws to regulate "internal affairs claims brought by stockholders *qua* stockholders."[3] But he stressed that Section 109(b) does *not* authorize a Delaware corporation to regulate external relationships. The *Boilermakers* decision noted that a bylaw cannot dictate the forum for tort or contract claims against the company, even if the plaintiff happens to be a stockholder.[4]

Section 102(b)(1) of the DGCL specifies what charter provisions can address. Its scope parallels Section 109(b), so the reasoning in *Boilermakers* applies to charter-based provisions.

The *Boilermakers* distinction between internal and external claims answers whether a forum-selection provision can govern claims under the 1933 Act. It cannot, because a 1933 Act claim is external to the corporation. Federal law creates the claim, defines the elements of the claim, and specifies who can be a plaintiff or defendant. The 1933 Act establishes a statutory regime that applies when a particular type of property—securities— is offered for sale in particular scenarios that the federal government has chosen to regulate. The cause of action belongs to a purchaser of a security, and it arises out of an offer or sale. The defined term "security" encompasses a wide range of financial products. Shares of

---

[3] *Id.* at 952.

[4] *Id.*

2

stock are just one of many types of securities, and shares in a Delaware corporation are just one subtype. A claim under the 1933 Act does not turn on the rights, powers, or preferences of the shares, language in the corporation's charter or bylaws, a provision in the DGCL, or the equitable relationships that flow from the internal structure of the corporation. Under *Boilermakers*, a 1933 Act claim is distinct from "internal affairs claims brought by stockholders *qua* stockholders."[5]

This result derives from first principles. The certificate of incorporation differs from an ordinary contract, in which private parties execute a private agreement in their personal capacities to allocate their rights and obligations. When accepted by the Delaware Secretary of State, the filing of a certificate of incorporation effectuates the sovereign act of creating a "body corporate"—a legally separate entity. The State of Delaware is an ever-present party to the resulting corporate contract, and the terms of the corporate contract incorporate the provisions of the DGCL. Various sections of the DGCL specify what the contract must contain, may contain, and cannot contain. The DGCL also constrains how the contract can be amended.

As the sovereign that created the entity, Delaware can use its corporate law to regulate the corporation's internal affairs. For example, Delaware corporate law can specify the rights, powers, and privileges of a share of stock, determine who holds a corporate office, and adjudicate the fiduciary relationships that exist within the corporate

---

[5] *Id.*

form. When doing so, Delaware deploys the corporate law to determine the parameters of the property rights that the state has chosen to create.

But Delaware's authority as the creator of the corporation does not extend to its creation's external relationships, particularly when the laws of other sovereigns govern those relationships. Other states exercise territorial jurisdiction over a Delaware corporation's external interactions. A Delaware corporation that operates in other states must abide by the labor, environmental, health and welfare, and securities law regimes (to name a few) that apply in those jurisdictions. When litigation arises out of those relationships, the DGCL cannot provide the necessary authority to regulate the claims.

This limitation applies even when the party asserting the claim happens to be a stockholder. Envision a customer who happens to own stock and who wishes to assert a product liability claim against the corporation. Even though the corporation's relationships with its customers are part of its business and affairs, and even though the customer-stockholder plaintiff would own stock, the shares are incidental to the operative legal relationship. Only a state exercising its territorial authority can regulate the product liability claim. Because the claim exists outside of the corporate contract, it is beyond the power of state corporate law to regulate.

This limitation applies even when shares of a Delaware corporation comprise the property that is the subject of the external claim. If a third party engages in the tort of conversion by stealing a stock certificate, the shares constitute the stolen property. The claim for conversion is not an attribute of the shares, nor does it arise out of the corporate contract. The fact that the stolen property consists of shares is incidental to the claim. The

4

legal relationship does not change if the corporation itself takes the shares. The conversion claim is still not an attribute of the shares, and it still does not arise out of the corporate contract. The same is true when a plaintiff asserts a claim for fraud involving shares. The speaker may have made fraudulent statements about the shares, or which relate to the shares, but the claim for fraud is not an attribute of the shares and does not arise out of the corporate contract.

Whether a purchaser of securities may have bought shares in a Delaware corporation is incidental to a claim under the 1933 Act. That happenstance does not provide a sufficient legal connection to enable the constitutive documents of a Delaware corporation to regulate the resulting lawsuit. The claim does not arise out of the corporate contract and does not implicate the internal affairs of the corporation. To the contrary, assuming the securities in question are shares, the claim arises from the investor's *purchase* of the shares. At the time the predicate act occurs, the purchaser is not yet a stockholder and lacks any relationship with the corporation that is grounded in corporate law.

The constitutive documents of a Delaware corporation cannot bind a plaintiff to a particular forum when the claim does not involve rights or relationships that were established by or under Delaware's corporate law. In this case, the Federal Forum Provisions attempt to accomplish that feat. They are therefore ineffective and invalid.

## I.       FACTUAL BACKGROUND

The facts are drawn from the materials presented in support of the cross-motions for summary judgment. The operative facts are undisputed.

5

## A.      The Federal Backdrop

The question of Delaware law presented by this case emerges from a backdrop of federal law. A basic understanding of the 1933 Act provides essential context.

### 1.      The 1933 Act

After the Crash of 1929, in the midst of the Great Depression, Congress enacted the 1933 Act "to promote honest practices in the securities markets."[6] The 1933 Act requires a company offering securities to the public "to make full and fair disclosure of relevant information" by filing a registration statement with the SEC.[7]

Congress created private rights of action for investors and provided that the causes of action could be asserted in state or federal court.[8] "More unusually, Congress also barred the removal of such actions from state to federal court. So if a plaintiff chose to bring a 1933 Act suit in state court, the defendant could not change the forum."[9]

Section 11 of the 1933 Act "allows purchasers of a registered security to sue certain

---

[6] *Cyan*, 138 S. Ct. at 1066. *See generally Fed. Hous. Fin. Agency v. Nomura Hldg. Am., Inc.*, 873 F.3d 85, 96 (2d Cir. 2017) ("In the wake of the Great Depression, Congress took measures to protect the U.S. economy from suffering another catastrophic collapse. Congress's first step in that endeavor was the Securities Act of 1933. The Act's chief innovation was to replace the traditional buyer-beware or *caveat emptor* rule of contract with an affirmative duty on sellers to disclose all material information fully and fairly prior to public offerings of securities. That change marked a paradigm shift in the securities markets." (citation omitted)).

[7] *See Cyan*, 138 S. Ct. at 1066 (internal quotation marks omitted).

[8] *Id.*

[9] *Id.* (citation omitted).

6

enumerated parties in a registered offering when false or misleading information is included in a registration statement."[10] Its purpose is to "assure compliance with the disclosure provisions of the Act by imposing a stringent standard of liability on the parties who play a direct role in a registered offering."[11] "If a plaintiff purchased a security issued pursuant to a registration statement, he need only show a material misstatement or omission to establish his *prima facie* case. Liability against the issuer of a security is virtually absolute, even for innocent misstatements."[12] "[E]very person who signed the registration statement" may be liable,[13] though defendants other than the issuer may avoid liability by proving a due diligence defense.[14]

---

[10] *Herman & MacLean v. Huddleston*, 459 U.S. 375, 381 (1983); *see* 15 U.S.C. § 77k(a) (providing for liability where "any part of the registration statement, when such part became effective, contained an untrue statement of a material fact or omitted to state a material fact required to be stated therein or necessary to make the statements therein not misleading"); *Omnicare, Inc. v. Laborers Dist. Council Const. Indus. Pension Fund*, 135 S. Ct. 1318, 1323 (2015) ("Section 11 . . . creates two ways to hold issuers liable for the contents of a registration statement—one focusing on what the statement says and the other on what it leaves out.").

[11] *Huddleston*, 459 U.S. at 381–82 (footnote omitted); *see Omnicare*, 135 S. Ct. at 1331 (explaining that Section 11 "establish[es] a strict liability offense promoting 'full and fair disclosure' of material information").

[12] *Huddleston*, 459 U.S. at 381 (footnote omitted).

[13] 15 U.S.C. § 77k(a)(1).

[14] *See Huddleston*, 459 U.S. at 382; 15 U.S.C. § 77k(b) (setting forth due diligence and other defenses); *see also* Donna M. Nagy et al., *Securities Litigation and Enforcement: Cases and Materials* 262 (2003) ("[U]nless the issuer proves that the plaintiff knew of the misstatement or omission at issue at the time of purchasing the security or unless the statute of limitations has run, the issuer has no defenses. . . . Defendants other than the issuer . . . . can avoid liability by establishing that they acted diligently in investigating the facts set forth in the registration statement. Such defendants may also avoid liability based on the

7

If a person offers securities without complying with the registration requirements of the 1933 Act, Section 12(a)(1) provides relief.[15] Section 12(a)(2) of the 1933 Act provides an additional cause of action when a prospectus contains material misstatements or omissions.[16]

## 2.     The PLSRA and SLUSA

In 1995, Congress passed the Private Securities Litigation Reform Act (the "PLSRA") to address "perceived abuses of the class-action vehicle in litigation involving

---

plaintiff's knowledge of the misstatement or omission, the statute of limitations, or negative causation." (citations omitted)).

[15] 15 U.S.C. § 77*l*(a)(1) (providing for liability for "[a]ny person who . . . offers or sells a security in violation of" Section 5 of the 1933 Act); *see Zacharias v. SEC*, 569 F.3d 458, 464 (D.C. Cir. 2009) ("Sections 5(a) and (c) of the Securities Act prohibit the 'sale' and 'offer for sale' of any securities unless a registration statement is in effect or there is an applicable exemption from registration."). *See generally Pinter v. Dahl*, 486 U.S. 622, 638 (1988) ("The primary purpose of the Securities Act is to protect investors by requiring publication of material information thought necessary to allow them to make informed investment decisions concerning public offerings of securities in interstate commerce. The registration requirements are the heart of the Act, and § 12(1) imposes strict liability for violating those requirements. Liability under § 12(1) is a particularly important enforcement tool, because in many instances a private suit is the only effective means of detecting and deterring a seller's wrongful failure to register securities before offering them for sale." (citations and footnote omitted)).

[16] 15 U.S.C. § 77*l*(a)(2) (providing for liability for "[a]ny person who . . . offers or sells a security . . . by means of a prospectus or oral communication, which includes an untrue statement of a material fact or omits to state a material fact necessary in order to make the statements, in the light of the circumstances under which they were made, not misleading"); *see Gustafson v. Alloyd Co.*, 513 U.S. 561, 571 (1995) ("Section 11 provides for liability on account of false registration statements; § 12(2) for liability based on misstatements in prospectuses.").

8

nationally traded securities."[17] According to the congressional findings, "nuisance filings, targeting of deep-pocket defendants, vexatious discovery requests, and 'manipulation by class action lawyers of the clients whom they purportedly represent' had become rampant in recent years."[18] The PSLRA imposed various procedural requirements for cases filed in federal court, including an automatic stay of discovery pending a decision on a motion to dismiss.[19]

The PSLRA "had an unintended consequence: It prompted at least some members of the plaintiffs' bar to avoid the federal forum altogether."[20] "Rather than face the obstacles set in their path by the [PSLRA], plaintiffs and their representatives began bringing class actions under state law, often in state court."[21]

In 1998, Congress adopted the Securities Litigation Uniform Standards Act ("SLUSA") to prevent plaintiffs from circumventing the PSLRA by filing state law claims

---

[17] *Merrill Lynch, Pierce, Fenner & Smith Inc. v. Dabit*, 547 U.S. 71, 81 (2006).

[18] *Id.*

[19] 15 U.S.C. § 77z–1; *see Cyan*, 138 S. Ct. at 1066–67.

[20] *Dabit*, 547 U.S. at 82.

[21] *Id.*; *see In re Lord Abbett Mutual Funds Fee Litig.*, 553 F.3d 248, 250 (3d Cir. 2009) ("In reaction to the rigors of the PSLRA, plaintiffs began filing cases in state courts under less strict state securities laws."); *see also Dabit*, 547 U.S. at 82 ("The evidence presented to Congress during a 1997 hearing to evaluate the effects of the [PSLRA] suggested that this phenomenon was a novel one; state-court litigation of class actions involving nationally traded securities had previously been rare.").

9

in state court.[22] SLUSA's core provision states:

> No covered class action based upon the statutory or common law of any State or subdivision thereof may be maintained in any State or Federal court by any private party alleging—
>
>> (1) an untrue statement or omission of a material fact in connection with the purchase or sale of a covered security; or
>>
>> (2) that the defendant used or employed any manipulative or deceptive device or contrivance in connection with the purchase or sale of a covered security.[23]

This decision refers to this provision as the "Federal Jurisdiction Statute."

The Federal Jurisdiction Statute forces plaintiffs to sue in federal court if they wish to pursue class-wide relief involving publicly traded securities on a fraud-based theory, regardless of whether the cause of action invokes federal or state law.[24] To make sure that plaintiffs cannot bypass the Federal Jurisdiction Statute by ignoring it and filing in state

---

[22] *See Dabit*, 547 U.S. at 82; *Madden v. Cowen & Co.*, 576 F.3d 957, 963–64 (9th Cir. 2009); *Sofonia v. Principal Life Ins. Co.*, 465 F.3d 873, 876 (8th Cir. 2006).

[23] 15 U.S.C. § 77p(b); *see also Dabit*, 547 U.S. at 83–84 (discussing provision in the Securities Exchange Act of 1934 that is analogous to the Federal Jurisdiction Statute).

[24] *See* 15 U.S.C. § 77p(f)(2)(A) (defining "covered class action"); *Cyan*, 138 S. Ct. at 1067 (explaining that the Federal Jurisdiction Statute "completely disallows (in both state and federal courts) sizable class actions that are founded on state law and allege dishonest practices respecting a nationally traded security's purchase or sale"). SLUSA recognized two exceptions known colloquially as the "Delaware carve-outs." *Malone v. Brincat*, 722 A.2d 5, 13 (Del. 1998). First, SLUSA permits an "exclusively derivative action" to be maintained in state court. 15 U.S.C. § 77p(f)(2)(B). Second, SLUSA authorizes class actions "based upon the statutory or common law of the State in which the issuer is incorporated" to be maintained in state court. 15 U.S.C. § 77p(d)(1)(A). These exceptions preserved the ability of state courts to continue hearing internal-affairs claims. *See Malone*, 722 A.2d at 13 n.42.

10

court, SLUSA permits the removal of certain class actions to federal court.[25]

SLUSA also modified the jurisdictional provision in the 1933 Act.[26] Before SLUSA, the 1933 Act provided that state and federal courts had concurrent jurisdiction over claims arising under the act.[27] SLUSA modified the statutory provision to say that concurrent jurisdiction existed "except as provided in [SLUSA].[28] Likewise, before SLUSA, the 1933 Act provided that claims brought in state court that asserted violations of the 1933 Act were not removable.[29] Congress amended this provision to preserve the prohibition on removal "[e]xcept as provided in [SLUSA]."[30]

### 3. A Federal Split Spurs Corporations To Impose Their Preference For A Federal Forum.

The federal courts split on how to interpret SLUSA's changes.[31] Some held that

---

[25] 15 U.S.C. § 77p(c); *see Cyan*, 138 S. Ct. at 1067.

[26] *Cyan*, 138 S. Ct. at 1067–68.

[27] *Id.* at 1068.

[28] 15 U.S.C. § 77v(a) ("The district courts of the United States . . . shall have jurisdiction . . . concurrent with State . . . courts, except as provided in [SLUSA] with respect to covered class actions, of all suits in equity and actions at law brought to enforce any liability or duty created by this subchapter.").

[29] *Cyan*, 138 S. Ct. at 1068.

[30] 15 U.S.C. § 77v(a) ("Except as provided in [SLUSA], no case arising under this subchapter and brought in any State court of competent jurisdiction shall be removed to any court of the United States.").

[31] *Cyan*, 138 S. Ct. at 1068–69 & n.1; *see Unschuld v. Tri-S Sec. Corp.*, 2007 WL 2729011, at *1 (N.D. Ga. Sept. 14, 2007) ("[B]ecause the specific removal provision and the general provision governing concurrent jurisdiction [over] federal securities [cases] are fraught with confusion, . . . . district courts are split, with some finding removal of such

11

SLUSA only permitted the removal of covered class actions that raised state law claims, while others held that claims under the 1933 Act could now be removed to federal court.[32]

Corporations and their advisors preferred federal court.[33] In an effort to lock in their preferred forum despite the split in authority on removal, corporations began adopting forum-selection provisions that identified the federal courts as the exclusive forum for 1933 Act claims.[34]

## B.    The Initial Public Offerings

On June 1, 2017, nominal defendant Blue Apron Holdings, Inc. filed a registration statement with the SEC for its shares of common stock and launched an initial public offering. Blue Apron is a Delaware corporation. Before filing its registration statement, Blue Apron adopted a charter-based Federal Forum Provision.

On September 1, 2017, nominal defendant Roku, Inc. filed a registration statement with the SEC for its shares of common stock and launched an initial public offering. Roku is a Delaware corporation. Before filing its registration statement, Roku adopted a charter-

---

federal claims from state court to be proper and with others finding that these federal claims must be remanded to state court.").

[32] *Compare, e.g.*, *Fortunato v. Akebia Therapeutics, Inc.*, 183 F. Supp. 3d 326 (D. Mass. 2016) (granting motion to remand), *with Brody v. Homestore, Inc.*, 240 F. Supp. 2d 1122 (C.D. Cal. 2003) (denying motion to remand). *See generally Niitsoo v. Alpha Nat. Res.*, 902 F. Supp. 2d 797, 800–807 (S.D.W. Va. 2012) (pre-*Cyan* discussion of multiple ways to interpret SLUSA's jurisdictional and removal provisions).

[33] *See* Donimirski Aff., Ex. A at 3 (presentation summarizing perceived advantages for defendants of litigating in federal court and concerns raised by litigating in state court).

[34] *See id.* at 2; *see also id.* at 10–11.

12

based Federal Forum Provision.

On October 19, 2017, Stitch Fix, Inc. filed a registration statement with the SEC for its shares of common stock and launched an initial public offering. Stitch Fix is a Delaware corporation. Before filing its registration statement, Stitch Fix adopted a charter-based Federal Forum Provision.

Roku and Stitch Fix adopted substantively identical provisions:

Unless the Company consents in writing to the selection of an alternative forum, the federal district courts of the United States of America shall be the exclusive forum for the resolution of any complaint asserting a cause of action arising under the Securities Act of 1933. Any person or entity purchasing or otherwise acquiring any interest in any security of the Corporation shall be deemed to have notice of and consented to [this provision].[35]

Blue Apron hedged a bit. Its provision states that "the federal district courts of the United States of America shall, *to the fullest extent permitted by law*, be the sole and exclusive forum for the resolution of any complaint asserting a cause of action arising under the Securities Act of 1933."[36] Except for this phrase, its provision tracked the other two.

## C.     This Litigation

Plaintiff Matthew Sciabacucchi bought shares of common stock under each nominal defendant's registration statement, either in the initial public offering or shortly thereafter. He therefore could sue under Section 11 of the 1933 Act to address any material

---

[35] Compl. ¶¶ 15–16.

[36] *Id.* ¶ 14 (emphasis added).

misstatements or omissions in the registration statements.[37] He likewise could sue under

Section 12(a)(1) to enforce the 1933 Act's registration requirements.[38] He potentially could

sue under Section 12(a)(2) over a material misstatement or omission in a prospectus.[39]

On December 29, 2017, Sciabacucchi filed this action. His complaint named as

defendants twenty individuals who signed the registration statements for Blue Apron,

Stitch Fix, and Roku and who have served as their directors since they went public. His

complaint sought a declaratory judgment that the Federal Forum Provisions are invalid.

**D.** **The Supreme Court of the United States Interprets SLUSA.**

On March 20, 2018, the Supreme Court of the United States resolved the split in

---

[37] *See DeMaria v. Andersen*, 318 F.3d 170, 176 (2d. Cir. 2003) ("[W]here there has been only one stock offering, any person who acquires the security may sue under § 11, 'regardless of whether he bought in the initial offering, a week later, or a month after that.'" (quoting *Hertzberg v. Dignity P'rs, Inc.*, 191 F.3d 1076, 1080 (9th Cir. 1999)).

[38] *See Pinter*, 486 U.S. at 642 ("[T]he language of § 12(1) contemplates a buyer-seller relationship not unlike traditional contractual privity. Thus, it is settled that § 12(1) imposes liability on the owner who passed title, or other interest in the security, to the buyer for value.").

[39] "There is no clear appellate authority as to whether aftermarket purchasers may have § 12(a)(2) standing." *In re Wash. Mut., Inc. Sec., Deriv. & ERISA Litig.*, 694 F. Supp. 2d 1192, 1225 (W.D. Wash. 2009). *Compare In re Wells Fargo Mortgage-Backed Certificates Litig.*, 712 F. Supp. 2d 958, 966 (N.D. Cal. 2010) ("Unlike Section 11, which permits an action by a plaintiff who has purchased a security that is merely 'traceable to' the challenged misstatement or omission, Section 12(a)(2) requires a plaintiff to plead and prove that it purchased a security directly from the issuer as part of the initial offering, rather than in the secondary market."), *with Feiner v. SS & C Techs., Inc.*, 47 F. Supp. 2d 250, 253 (D. Conn. 1999) ("This court now holds that § 12(a)(2) extends to aftermarket trading of a publicly offered security, so long as that aftermarket trading occurs 'by means of a prospectus or oral communication.'" (quoting 15 U.S.C. § 77*l*(a)(2)). *See generally Primo v. Pac. Biosciences of Cal., Inc.*, 940 F. Supp. 2d 1105, 1124 (N.D. Cal. 2013) (describing split in authority).

14

federal authority over SLUSA's implications for the jurisdictional and removal provisions in the 1933 Act. The justices held that class actions filed in state court which asserted violations of the 1933 Act could not be removed to federal court.[40] After the decision, under the federal regime, a plaintiff wishing to sue under the 1933 Act could maintain an action in either state or federal court.

## II.    LEGAL ANALYSIS

The parties have filed cross motions for summary judgment. Summary judgment may be granted if the moving party demonstrates that there is "no genuine issue as to any material fact" and that it is "entitled to a judgment as a matter of law."[41] A facial challenge to the Federal Forum Provisions presents a question of law suitable for disposition on a motion for summary judgment.[42]

## A.    Existing Law Indicates That The Federal Forum Provisions Are Ineffective.

The practice of including forum-selection provisions in the constitutive documents of a corporation is a relatively recent development.[43] The arc of the law in this area provides

---

[40] *Cyan*, 138 S. Ct. at 1069.

[41] Ct. Ch. R. 56(c).

[42] *See ATP Tour, Inc. v. Deutscher Tennis Bund*, 91 A.3d 554, 557 (Del. 2014) (addressing certified question regarding facial validity of fee-shifting bylaw as a matter of law); *Solak v. Sarowitz*, 153 A.3d 729, 740 (Del. Ch. 2016) (deciding facial challenge to fee-shifting bylaw as a matter of law in context of a Rule 12(b)(6) motion to dismiss); *Boilermakers*, 73 A.3d at 938–39 (addressing facial validity of forum-selection bylaw as a matter of law in ruling on Rule 12(c) motion for judgment on the pleadings).

[43] *See, e.g.*, Helen Hershkoff & Marcel Kahan, *Forum-Selection Provisions in Corporate "Contracts"*, 93 Wash. L. Rev. 265, 267 (2018) (describing the "emergent practice" of "including a clause in a corporation's charter or bylaws that specifies and so

insight into the permissible scope of forum-selection provisions. The authorities indicate that the Federal Forum Provisions cannot accomplish what they attempt to achieve.

### 1. The Origins Of The Corporate Forum-Selection Phenomenon

The impetus for corporate forum-selection provisions came from an epidemic of stockholder litigation, in which competing plaintiffs filed a bevy of lawsuits, often in different multiple jurisdictions, before settling for non-monetary relief and an award of attorneys' fees.[44] These frequently meritless cases imposed costs on corporations and society without concomitant benefit. Courts had to expend resources coordinating the actions and processing non-substantive settlements.[45]

---

limits where lawsuits may be filed"); George S. Geis, *Ex-Ante Corporate Governance*, 41 J. Corp. L. 609, 611 (2016) ("Long neglected, bylaws are gaining new attention as a vehicle for expanding, constraining, or channeling power in the corporate ecosystem."); Verity Winship, *Shareholder Litigation by Contract*, 96 B.U. L. Rev. 486, 487 (2016) [hereinafter *Shareholder Litigation*] (tracing development of "corporate contract procedure," including forum-selection provisions).

[44] *See, e.g.*, Verity Winship, *Contracting Around Securities Litigation: Some Thoughts on the Scope of Litigation Bylaws*, 68 SMU L. Rev. 913, 914 (2015) [hereinafter *Contracting*] (describing "[a] particular litigation pattern [that] triggered the development of these clauses"). *See generally* Edward B. Micheletti & Jenness E. Parker, *Multi-Jurisdictional Litigation: Who Caused This Problem, and Can It Be Fixed?*, 37 Del. J. Corp. L. 1, 6–14 (2016).

[45] *See generally In re Trulia, Inc. S'holder Litig.*, 129 A.3d 884, 891–99 (Del. Ch. 2016); Jill E. Fisch, Sean J. Griffith & Steven Davidoff Solomon, *Confronting the Peppercorn Settlement in Merger Litigation: An Empirical Analysis and a Proposal for Reform*, 93 Tex. L. Rev. 557, 557–72 (2015); Browning Jeffries, *The Plaintiffs' Lawyer's Transaction Tax: The New Cost of Doing Business in Public Company Deals*, 11 Berkeley Bus. L.J. 55, 66–91 (2014); Sean J. Griffith & Alexandra D. Lahav, *The Market for Preclusion in Merger Litigation*, 66 Vand. L. Rev. 1053, 1060–73 (2013).

In *Revlon*,[46] I replaced class counsel for failing to provide adequate representation when agreeing to a non-substantive settlement. When discussing the policy rationale for this outcome, I posited that "[a]ll else equal, the threat of replacement should cause representative counsel to invest more significantly in individual cases, which in turn should lead representative counsel to analyze cases to identify actions whose potential merit justifies the investment."[47] But I recognized that if Delaware sought to regulate abusive litigation, then plaintiffs' counsel might "accelerate their efforts to populate their portfolios by filing in other jurisdictions."[48] As a possible response, I suggested: "If they do, and if boards of directors and stockholders believe that a particular forum would provide an efficient and value-promoting locus for dispute resolution, then corporations are free to respond with charter provisions selecting an exclusive forum for intra-entity disputes."[49]

---

[46] *In re Revlon, Inc. S'holders Litig.*, 990 A.2d 940 (Del. Ch. 2010).

[47] *Id.* at 960.

[48] *Id.* (citing *Anywhere But Chancery: Ted Mirvis Sounds an Alarm and Suggests Some Solutions*, M&A J. May 2007, at 17, 17).

[49] *Id.* (citing 8 *Del. C.* § 102(b)(1)). I focused on charter-based provisions because I harbored concern about Sections 102(a)(4) and 151(a) of the DGCL, which generally require that any qualifications, limitations, or restrictions on the rights, powers, and preferences of shares appear in the certificate of incorporation. *See* 8 *Del. C.* §§ 102(a)(4), 151(a). Stockholders possess three fundamental rights: to vote, sell, and sue. *Strougo v. Hollander*, 111 A.3d 590, 595 n.21 (Del. Ch. 2015). It seemed arguable that a forum-selection provision constituted a limitation or restriction on the right to sue that needed to appear in the charter. Although Section 109(b) of the DGCL permits bylaws "relating to" a wide range of subjects, including "the rights or powers of [the] stockholders," that section recognizes that a bylaw cannot be "inconsistent with law or with the certificate of incorporation . . . ." 8 *Del. C.* § 109(b). "For purposes of evaluating the statutory validity of a bylaw, therefore, it is not enough to measure it only against the 'relating to' language

Because the *Revlon* case did not involve a forum-selection provision, I observed that "[t]he issues implicated by an exclusive forum selection provision must await resolution in an appropriate case."[50] It was nevertheless my expectation that a forum-selection provision implemented through the corporation's constitutive documents only would extend to "intra-entity disputes."[51]

The *Revlon* dictum appears to have stirred practitioners and their clients to adopt

---

of Section 109(b). It is also necessary to consider what other sections of the DGCL say about the matter." *Sinchareonkul v. Fahnemann*, 2015 WL 292314, at \*7 (Del. Ch. Jan. 22, 2015). To avoid hazarding a view on the viability of a bylaw-based forum-selection provision, I only referred to charter provisions, where these statutory issues did not arise.

Arguments about the locus of forum-selection provisions evolved in a different direction. Rather than considering Sections 102(a)(4) and 151, the arguments prioritized the different approvals required for implementation or removal. Subsequent Court of Chancery decisions held that a bylaw-based forum-selection provision represented a statutorily valid exercise of authority under Section 109(b). *See City of Providence v. First Citizen BancShares, Inc.*, 99 A.3d 229, 233–34 (Del. Ch. 2014); *Boilermakers*, 73 A.3d at 951–56. Although these holdings did not address Sections 102(a)(4) or 151, the *Boilermakers* decision cited the distinction between bylaws that validly establish procedural requirements and those that invalidly attempt to impose substantive limitations. 73 A.3d at 951–52 (citing *CA, Inc. v. AFSCME Empls. Pension Plan*, 953 A.2d 227, 236–37 (Del. 2008)). In my view, the same distinction would apply for purposes of Sections 102(a)(4) and 151. Under these provisions, a substantive limitation must appear in the charter; a procedural regulation can appear in the bylaws. *See CA*, 953 A.2d at 235 (describing bylaws as "procedural" and "process-oriented").

The General Assembly has now authorized both charter-based and bylaw-based forum-selection provisions, rendering moot any concern about Sections 102(a)(4) or 151 for these clauses. *See* 8 *Del. C.* § 115. The implications of Sections 102(a)(4) and 151 remain salient for other types of provisions. *See* Geis, *supra*, at 640–42.

[50] *Revlon*, 990 A.2d at 960 n.8.

[51] *See id.* at 960.

18

forum-selection provisions.[52] Before *Revlon*, forum-selection provisions appeared in the charters or bylaws of sixteen publicly traded companies.[53] A year later, approximately 195 public companies had either adopted forum-selection provisions or proposed them.[54] By August 2014, 746 publicly traded corporations had adopted them.[55]

### 2. *Boilermakers*

In 2013, while serving as Chancellor, Chief Justice Strine issued the seminal decision on the validity of forum-selection provisions in the corporate contract. FedEx Corporation and Chevron Corporation had both adopted forum-selection bylaws. In *Boilermakers*, stockholders challenged these provisions, asserting that the corporations lacked authority to adopt them under Section 109(b) of the DGCL.

The FedEx bylaw stated:

Unless the Corporation consents in writing to the selection of an alternative forum, the Court of Chancery of the State of Delaware shall be the sole and

---

[52] *See, e.g.*, Winship, *Contracting*, at 915 (positing that corporations and their advisors responded to the *Revlon* dictum); Joseph A. Grundfest, *The History and Evolution of Intra-Corporate Forum Selection Clauses: An Empirical Analysis*, 37 Del. J. Corp. L. 333, 339 (2012) ("During the fifteen months between Revlon's issuance on March 16, 2010, and the June 30, 2011 cut-off date for this Article's data analysis, the population of publicly traded entities with intra-corporate forum selection clauses in their organic documents more than octupled, increasing from 16 to 133.").

[53] Grundfest, *supra*, at 336.

[54] Dominick T. Gattuso & Meghan A. Adams, *Delaware Insider: Forum Selection Provisions in Corporate Charters and Bylaws: Validity vs. Enforceability*, Bus. L. Today, Dec. 2013, at 1, 1.

[55] *See* Matthew D. Cain, Jill E. Fisch, Steven Davidoff Solomon & Randall S. Thomas, *The Shifting Tides of Merger Litigation*, 71 Vand. L. Rev. 603, 618 (2018).

exclusive forum for

> (i) any derivative action or proceeding brought on behalf of the Corporation,
>
> (ii) any action asserting a claim of breach of a fiduciary duty owed by any director, officer or other employee of the Corporation to the Corporation or the Corporation's stockholders,
>
> (iii) any action asserting a claim arising pursuant to any provision of the Delaware General Corporation Law, or
>
> (iv) any action asserting a claim governed by the internal affairs doctrine.
>
> Any person or entity purchasing or otherwise acquiring any interest in shares of capital stock of the Corporation shall be deemed to have notice of any consented to the provisions of this [bylaw].[56]

Chevron's bylaw originally tracked FedEx's, but in response to the lawsuit, Chevron's board amended it in two ways. First, the amended bylaw permitted suits to be filed in any state or federal court in Delaware having jurisdiction over the subject matter and the parties. Second, the amended bylaw would not apply unless the court in Delaware could exercise personal jurisdiction over all indispensable parties to the action.[57]

The defendants argued that the provisions covered four types of suits:

- *Derivative suits.* The issue of whether a derivative plaintiff is qualified to sue on behalf of the corporation and whether that derivative plaintiff has or is excused from making demand on the board is a matter of corporate governance, because it goes to the very nature of who may speak for the corporation.

- *Fiduciary duty suits.* The law of fiduciary duties regulates the

---

[56] *Boilermakers*, 73 A.3d at 942 (alteration in original) (formatting added).

[57] *Id.*

20

relationships between directors, officers, the corporation, and its stockholders.

- *D.G.C.L. suits.* The Delaware General Corporation Law provides the underpinning framework for all Delaware corporations. That statute goes to the core of how such corporations are governed.

- *Internal affairs suits.* As the U.S. Supreme Court has explained, "internal affairs," in the context of corporate law, are those "matters peculiar to the relationships among or between the corporation and its current officers, directors, and shareholders."[58]

Although the defendants reserved the "internal affairs" label for the fourth category, all four types involved the internal affairs of a Delaware corporation. Chief Justice Strine described the categories as "all relating to internal corporate governance[.]"[59]

Because the forum-selection provisions appeared in the bylaws, Chief Justice Strine examined their facial validity under Section 109(b). At the time, this statutory provision stated: "The bylaws may contain any provision, not inconsistent with law or with the certificate of incorporation, relating to the business of the corporation, the conduct of its affairs, and its rights or powers or the rights or powers of its stockholders, directors, officers or employees."[60]

---

[58] *Id.* at 943 (quoting Defs.' Opening Br. 30–31 (quoting *Edgar v. MITE Corp.*, 457 U.S. 624, 645 (1982))).

[59] *Id.* at 942; *accord id.* at 943 (observing that the defendants' description of the forum-selection bylaws was "consistent with what the plain language of the bylaws suggests" and that the bylaws were intended only to regulate "*where* internal governance suits may be brought").

[60] 8 *Del. C.* § 109(b). As discussed later, the General Assembly amended Section 109(b) in 2015 to add a second sentence: "The bylaws may not contain any provision that would impose liability on a stockholder for the attorneys' fees or expenses of the

21

Chief Justice Strine had no difficulty holding that the forum-selection bylaws fell within the scope of Section 109(b) because, as he repeatedly noted, they addressed internal-affairs claims:

> As a matter of easy linguistics, the forum selection bylaws address the "rights" of the stockholders, because they regulate where stockholders can exercise their right to bring certain internal affairs claims against the corporation and its directors and officers. They also plainly relate to the conduct of the corporation by channeling internal affairs cases into the courts of the state of incorporation, providing for the opportunity to have internal affairs cases resolved authoritatively by our Supreme Court if any party wishes to take an appeal. That is, because the forum selection bylaws address internal affairs claims, the subject matter of the actions the bylaws govern relates quintessentially to "the corporation's business, the conduct of its affairs, and the rights of its stockholders [*qua* stockholders]."[61]

Notably, Chief Justice Strine did not stop with the statutory language—"rights of its stockholders"—but emphasized that the forum-selection bylaws governed the rights of "stockholders *qua* stockholders."

Consistent with this point of emphasis, Chief Justice Strine provided two examples of the causes of action that a bylaw could not regulate:

> By contrast, the bylaws would be regulating external matters if the board adopted a bylaw that purported to bind a plaintiff, even a stockholder plaintiff, who sought to bring a tort claim against the company based on a personal injury she suffered that occurred on the company's premises or a contract claim based on a commercial contract with the corporation.[62]

---

corporation or any other party in connection with an internal corporate claim, as defined in § 115 of this title."

[61] *Boilermakers*, 73 A.3d at 950–51 (alteration in original) (footnotes omitted) (quoting 8 *Del. C.* § 109(b)).

[62] *Id.* at 952.

Leaving no doubt that a bylaw could not regulate cases of this type, Chief Justice Strine stated: "The reason why those kinds of bylaws would be beyond the statutory language of 8 *Del. C.* § 109(b) is obvious: the bylaws would not deal with the rights and powers of the plaintiff-stockholder *as a stockholder*."[63] Later in the opinion, Chief Justice Strine emphasized that the bylaws did not purport "in any way to foreclose a plaintiff from exercising any statutory right of action created by the federal government."[64]

*Boilermakers* thus validated the ability of a corporation to adopt a forum-selection provision for internal-affairs claims. The phrase "internal affairs" appears four times in the opening paragraph, and the decision as a whole deployed either those words or an equivalent concept (such as "internal governance") over forty times. The decision also drew a line at internal-affairs claims. When describing cases where it would be "obvious" that a forum-selection provision would not apply, the decision cited causes of action that did not involve internal affairs, such as tort or contract claims that did not depend on the stockholder's rights *qua* stockholder.

### 3.   *ATP*

After *Boilermakers*, commentators debated whether charter and bylaw provisions could regulate other aspects of stockholder litigation.[65] In *ATP*, the Delaware Supreme

---

[63] *Id.*

[64] *Id.* at 962.

[65] *See, e.g.*, Alison Frankel, *Wake Up, Shareholders! Your Right to Sue Corporations May Be in Danger*, Reuters, June 25, 2013, https://www.reuters.com/article/us-column-frankel-shareholders-idUSBRE95O1HO20130625 (positing that "[a] company

23

Court moved beyond forum selection by upholding the validity of a fee-shifting provision in the bylaws of a non-stock corporation that applied to "intra-corporate litigation."[66]

The *ATP* decision addressed four questions of law that the United States District Court for the District of Delaware had certified to the Delaware Supreme Court.[67] The underlying suit involved a membership corporation that operated a men's tennis league (the "League"). The League's members included entities that owned and operated tournaments. Two members sued the League after the board of directors made changes to the tour schedule.[68] The plaintiffs asserted federal antitrust claims and state law claims for breach of fiduciary duty, tortious interference with contract, and conversion.[69] The district court granted the League's motion for judgment as a matter of law on the state law claims, and a jury found in the League's favor on the antitrust claims.[70]

---

could evade the SEC's IPO strictures by imposing mandatory shareholder arbitration through a bylaw amendment rather than in a charter, pointing to [the] language [in *Boilermakers*] on shareholders' implicit contractual consent. Then, when shareholders claimed their statutory rights were cut off because they couldn't vindicate securities fraud or breach-of-duty claims through individual arbitration, the corporation could point to [*American Express Co. v. Italian Colors Restaurant*, 570 U.S. 228 (2013)] and say, 'Tough luck.'").

[66] *See ATP*, 91 A.3d at 555. Later, the Delaware Supreme Court observed that "[a] bylaw that allocates risk among parties in intra-corporate litigation" would satisfy the requirements of Section 109(b). *Id.* at 558.

[67] *Id.* at 557.

[68] *Id.* at 556.

[69] *See* Winship, *Shareholder Litigation*, at 508 (describing complaint).

[70] *See id.* (describing trial court outcome).

24

Having prevailed on all counts, the League moved to recover $17,865,504.51 in expenses.[71] As the sole basis for its recovery, the League relied on the following bylaw:

> In the event that (i) any Claiming Party initiates or asserts any Claim . . . against the League or any member or owners (including any Claim purportedly filed on behalf of the League or any member), and (ii) the Claiming Party . . . does not obtain a judgment on the merits that substantially achieves, in substance and amount, the full remedy sought, then each Claiming Party shall be obligated jointly and severally to reimburse the League and any such member or Owners for all fees, costs and expenses of every kind and description (including, but not limited to, all reasonable attorneys' fees and other litigation expenses) . . . that the parties may incur in connection with such Claim.[72]

The district court denied the application, observing that the League had cited "no case in which a court held that a board-adopted corporate bylaw can form the basis for the recovery of attorney's fees from members who sue the corporation, much less in actions where the bylaws are not directly in the dispute."[73] The district court also noted that the bylaw had been "adopted only *after* the plaintiff became a member of the corporation"[74] and "less than five months before the complaint in this case was filed," at a time when the League's board was discussing the events giving rise to the litigation.[75] In the dispositive portion of its analysis, the court reasoned that "allowing antitrust defendants to collect attorneys' fees

---

[71] *Deutscher Tennis Bund v. ATP Tour, Inc.*, 2009 WL 3367041, at *1 (D. Del. Oct. 19, 2009), *vacated*, 480 Fed. App'x 124 (3d Cir. 2012).

[72] *Id.*

[73] *Id.* at *3.

[74] *Id.*

[75] *Id.* at *4 n.4.

25

in this case would be contrary both to longstanding Third Circuit precedent and to the policies underlying the federal antitrust laws."[76]

On appeal, in a *per curiam* ruling, the United States Court of Appeals for the Third Circuit reversed. The Court of Appeals held that the district court should have determined whether the fee-shifting bylaw was enforceable under Delaware law before considering whether it was preempted by the antitrust laws.[77] The Court of Appeals expressed "doubts that Delaware courts would conclude that Article 23.3 imposes a legally enforceable burden on [the plaintiffs]."[78]

After the remand, the district court certified four questions to the Delaware Supreme Court:

> 1. May the Board of a Delaware non-stock corporation lawfully adopt a bylaw (i) that applies in the event that a member brings a claim against another member, a member sues the corporation, or the corporation sues a member (ii) pursuant to which the claimant is obligated to pay for "all fees, costs, and expenses of every kind and description (including, but not limited to, all reasonable attorneys' fees and other litigation expenses)" of the party against which the claim is made in the event that the claimant "does not obtain a judgment on the merits that substantially achieves, in substance and amount, the full remedy sought"?

---

[76] *See id.* at *3 (citing *Byram Concretetanks, Inc. v. Warren Concrete Prods. Co.*, 374 F.2d 649, 651 (3d Cir. 1967)).

[77] *Deutscher Tennis Bund v. ATP Tour, Inc.*, 480 Fed. App'x 124, 127 (3d Cir. 2012) ("Because a determination that Article 23.3 is invalid under Delaware law would allow us (and the District Court) to avoid the constitutional question of preemption, it is an independent state law ground. Consequently, the by-law validity issue needs to be addressed, and a finding of validity must be made, before the constitutional issue of preemption can be considered.").

[78] *Id.*

2. May such a bylaw be lawfully enforced against a member that obtains no relief at all on its claims against the corporation, even if the bylaw might be unenforceable in a different situation where the member obtains some relief?

3. Is such a bylaw rendered unenforceable as a matter of law if one or more Board members subjectively intended the adoption of the bylaw to deter legal challenges by members to other potential corporate action then under consideration?

4. Is such a bylaw enforceable against a member if it was adopted after the member had joined the corporation, but where the member had agreed to be bound by the corporation's rules "that may be adopted and/or amended from time to time" by the corporation's Board, and where the member was a member at the time that it commenced the lawsuit against the corporation?[79]

The Delaware Supreme Court answered the first, second, and fourth question in the affirmative, but held that it could not answer the third question as a matter of law.

When addressing the first question, the Delaware Supreme Court held that the bylaw fell within the scope of Section 109(b) of the DGCL. As the high court explained, "[a] bylaw that allocates risk among parties in intra-corporate litigation would . . . appear to satisfy the DGCL's requirement that bylaws must 'relat[e] to the business of the corporation, the conduct of its affairs, and its rights or powers or the rights or powers of its stockholders, directors, officers or employees.'"[80] The court therefore concluded that the fee-shifting bylaw was a facially valid exercise of corporate authority.

For present purposes, the Delaware Supreme Court's repeated references to "intra-

---

[79] *ATP*, 91 A.3d at 557.

[80] *Id.* at 558 (quoting 8 *Del. C.* § 109(b)).

corporate litigation" are important.[81] Although the plaintiffs in the underlying action also asserted claims for antitrust violations, tortious interference, and conversion, the Delaware Supreme Court interpreted the certified question as only asking about the validity of the bylaw for purposes of "intra-corporate litigation."[82] The Delaware Supreme Court then held that the bylaw was facially valid because it "allocate[d] risk among parties in intra-corporate litigation . . . ."[83] The Delaware Supreme Court did not suggest that that the corporate contract can be used to regulate other types of claims.

### 4. The 2015 Amendments

In 2015, the Corporation Law Council of the Delaware State Bar Association recommended that the General Assembly enact legislation that addressed both forum-selection provisions and fee-shifting provisions.[84] The General Assembly responded by

---

[81] *See id.* at 555, 557–558.

[82] *Id.* at 557 ("The first certified question asks whether the board of a Delaware non-stock corporation may lawfully adopt a bylaw that shifts all litigation expenses to a plaintiff in intra-corporate litigation who 'does not obtain a judgment on the merits that substantially achieves, in substance and amount, the full remedy sought.'" (footnotes omitted)).

[83] *Id.* at 558; *see* Henry duPont Ridgely, *The Emerging Role of Bylaws in Corporate Governance*, 68 SMU L. Rev. 317, 325 (2015) (describing the *ATP* ruling as addressing a bylaw involving "an intra-corporate suit"); Ann M. Lipton, *Manufactured Consent: The Problem of Arbitration Clauses in Corporate Charters and Bylaws*, 104 Geo. L.J. 583, 599 (2016) ("*ATP Tour* likewise limited its discussion of fee-shifting bylaws only to claims concerning intra-corporate litigation (an oddity to be sure, because the bylaw at issue purported to extend to *any* claim brought by a member, and the case was certified to the Delaware Supreme Court out of concern for the bylaw's application to the antitrust laws)." (footnotes omitted)).

[84] *See* Corporation Law Council, *Explanation of Council Legislative Proposal* (2015) [hereinafter *Explanation of Council*], *available at* Dkt. 26, Tab 7.

adding Section 115 to the DGCL and amending Sections 102 and 109.[85]

The new Section 115 addressed the ability of Delaware corporations to adopt forum-selection provisions in their charters and bylaws. It states:

> The certificate of incorporation or the bylaws may require, consistent with applicable jurisdictional requirements, that any or all internal corporate claims shall be brought solely and exclusively in any or all of the courts in this State, and no provision of the certificate of incorporation or the bylaws may prohibit bringing such claims in the courts of this State.
>
> "Internal corporate claims" means claims, including claims in the right of the corporation, (i) that are based upon a violation of a duty by a current or former director or officer or stockholder in such capacity, or (ii) as to which this title confers jurisdiction upon the Court of Chancery.[86]

The General Assembly thus addressed only "internal corporate claims," defined to encompass claims covered by the internal-affairs doctrine.[87]

Through the adoption of Section 115, the General Assembly codified the ruling in *Boilermakers*.[88] When describing the intent of that provision before recommending it to the General Assembly, the Corporation Law Council stated that "[t]he proposed legislation

---

[85] *See* Del. S.B. 75 syn., 148th Gen. Assem. (2015).

[86] 8 *Del. C.* § 115 (formatting added).

[87] *See generally* Lawrence A. Hamermesh & Norman M. Monhait, *Fee-Shifting Bylaw: A Study in Federalism*, Institute of Delaware Corporate and Business Law (June 29, 2015) ("By its terms, the legislation only applies to bylaws that provide for fee-shifting in connection with 'internal corporate claims.'"), http://blogs.law.widener.edu/delcorp/2015/06/29/fee-shifting-bylaws-a-study-in-federalism/.

[88] *Solak*, 153 A.3d at 732 ("In 2015, Section 115 was added to the [DGCL], codifying this Court's decision in *Boilermakers* . . . .").

would give statutory force to the *Boilermakers* decision."[89] The synopsis of the bill expanded on this statement:

> New Section 115 confirms, as held in [*Boilermakers*], that the certificate of incorporation and bylaws of the corporation may effectively specify, consistent with applicable jurisdictional requirements, that claims arising under the DGCL, including claims of breach of fiduciary duty by current or former directors or officers or controlling stockholders of the corporation, or persons who aid and abet such a breach, must be brought only in the courts (including the federal court) in this State.[90]

As the parties recognize, Section 115 does not say explicitly that the charter or bylaws cannot include forum-selection provisions addressing other types of claims. The omission comports with the precedent leading up to Section 115, which recognized that the charter and bylaws can only address internal-affairs claims. Two past presidents and leading members of the Corporation Law Council have said as much. Responding to a debate about whether Section 115 permits Delaware corporations to adopt charter or bylaw provisions that would regulate securities law claims, they agreed that a securities law claim is not an "internal corporate claim" within the meaning of the amendments.[91] But they regarded that fact as beside the point, because the corporate charter and bylaws could not be used to regulate external claims.[92] They explained that in light of these views, the

---

[89] *Explanation of Council*, *supra*, at 9.

[90] Del. S.B. 75 syn., 148th Gen. Assem. (2015).

[91] *See generally* Hamermesh & Monhait, *supra*.

[92] *See id.* ("[S]ections 102(b)(1) and 109(b) cannot be read, despite their breadth and the presumptive validity of provisions adopted pursuant to them, to authorize provisions regulating litigation under the federal securities laws."); *id.* ("[T]he subject matter scope of Sections 102(b)(1) and 109(b) is broad. But it is not limitless . . . . And in our view, it does

Council "saw no reason for a statutory amendment that purported to reach beyond the confines of internal governance litigation . . . ."[93]

In addition to enacting Section 115 to codify *Boilermakers*, the General Assembly amended Sections 102 and 109 to "limit *ATP* to its facts . . . ."[94] Together, the amended sections ban fee-shifting provisions from both the charter and the bylaws. To address charter-based provisions, the General Assembly adopted a new Section 102(f), which states: "The certificate of incorporation may not contain any provision that would impose liability on a stockholder for attorneys' fees or expenses of the corporation, or any other party in connection with an internal corporate claim, as defined in § 115 of this title."[95] To address bylaw-based provisions, the General Assembly added a sentence to Section 109(b), which states: "The bylaws may not contain any provision that would impose liability on a stockholder for the attorneys' fees or expenses of the corporation or any other party in connection with an internal corporate claim, as defined in § 115 of this title."

The amendments to Sections 102 and 109 reinforce the conclusion that the

---

not extend so far as to permit the charter or the bylaws to create a power to bind stockholders in regard to fee-shifting in, or the venue for, federal securities class actions.").

[93] *Id.*

[94] *See Solak*, 153 A.3d at 734 ("Within one year of the *ATP* decision, the Corporation Law Council of the Delaware State Bar Association proposed legislation to 'limit *ATP* to its facts' and prevent the boards of Delaware stock corporations from adopting fee-shifting bylaws." (quoting *Explanation of Council*, *supra*, at 12)); *see also Explanation of Council*, *supra*, at 4–6, 9 (explaining Corporation Law Council's rationale for proposing ban on fee-shifting provisions).

[95] 8 *Del. C.* § 102(f).

Corporation Law Council and the General Assembly only believed that the charter and bylaws could regulate internal corporate claims. Their overarching policy goal was to ban fee-shifting provisions from the corporate contract.[96] If they thought that the charter or bylaws could regulate other types of claims, then the prohibitions would have swept more broadly. The drafters would not have taken the half measure of banning fee-shifting provisions for a subset of claims, thereby permitting experimentation in other areas.

### 5. Implications For This Case

The development of the law governing forum-selection provisions indicates that the nominal defendants cannot use the Federal Forum Provisions to specify a forum for 1933 Act claims.

First, the reasoning in *Boilermakers* applies equally to a charter-based provision. The language of Section 102(b)(1) states:

> In addition to the matters required to be set forth in the certificate of incorporation by subsection (a) of this section, the certificate of incorporation may also contain any or all of the following matters:
>
> (1) Any provision for the management of the business and for the conduct of the affairs of the corporation, and any provision creating, defining, limiting and regulating the powers of the corporation, the directors, and the stockholders, or any class of the stockholders, or the governing body, members, or any class or group of members of a nonstock corporation; if such provisions are not contrary to the laws of this State. Any provision which is required or permitted by any section of this chapter to be stated in the bylaws may instead be stated in the certificate of incorporation . . . .[97]

---

[96] *See Solak*, 153 A.3d at 741–42.

[97] 8 *Del. C.* § 102(b)(1).

As leading commentators have observed, "[t]he language of Section 109(b) dealing with the subject matter of bylaws parallels in large measure the language of Section 102(b)(1) dealing with what may be included in a certificate of incorporation."[98] Stitch Fix and Roku agree that "[a]lthough there are subtle differences between the language of Sections 102(b)(1) and 109(b), the provisions are generally viewed as covering the same broad subject matter."[99]

To reiterate, the authorizing language of Section 109(b) states that "[t]he bylaws may contain any provision, not inconsistent with law or with the certificate of incorporation, relating to [1] the business of the corporation, [2] the conduct of its affairs, and [3] its rights or powers or [4] the rights or powers of its stockholders, directors, officers or employees."[100] Although its phrasing differs slightly, Section 102(b)(1) permits the certificate of incorporation to address the same subjects:

> [1 & 2] [T]he management of the business and for the conduct of the affairs of the corporation, and [3 & 4] any provision creating, defining, limiting and regulating the powers of the corporation, the directors, and the stockholders, or any class of the stockholders . . . if such provisions are not contrary to the laws of this State.[101]

---

[98] 1 David A. Drexler et al., *Delaware Corporation Law and Practice* § 9.03, at 9-5 to -6 (2018) (footnote omitted); *see Strougo*, 111 A.3d at 599 n.42 (interpreting Section 109(b) but noting that "[a]n equivalent limitation would apply to charter provisions" because of the comparable scope of Sections 109(b) and 102(b)(1)).

[99] Dkt. 18, at 20 n.14.

[100] 8 *Del. C.* § 109(b).

[101] 8 *Del. C.* § 102(b)(1).

If anything, Section 109(b) is slightly broader, because it includes "employees," whom Section 102(b)(1) does not mention.

The parallelism between Sections 109(b) and 102(b)(1) means that Chief Justice Strine's distinction in *Boilermakers* between internal and external claims applies equally to charter-based provisions. Such a provision cannot "bind a plaintiff, even a stockholder plaintiff, who sought to bring a tort claim against the company based on a personal injury she suffered that occurred on the company's premises or a contract claim based on a commercial contract with the corporation."[102] A charter-based forum-selection provision cannot govern these claims because the provision would not be addressing "the rights and powers of the plaintiff-stockholder *as a stockholder*."[103]

This reasoning applies fully to claims under the 1933 Act, which assert specialized and wholly statutory causes of action:

> Although limited in scope, Section 11 [of the 1933 Act] places a relatively minimal burden on a plaintiff. In contrast, Section 10(b) [of the Securities and Exchange Act of 1934] is a "catchall" antifraud provision, but it requires a plaintiff to carry a heavier burden to establish a cause of action. While a Section 11 action must be brought by a purchaser of a registered security, must be based on misstatements or omissions in a registration statement, and can only be brought against certain parties, a Section 10(b) action can be brought by a purchaser or seller of "*any* security" against "*any* person" who has used "*any* manipulative or deceptive device or contrivance" in connection with the purchase or sale of a security. However, [unlike with a

---

[102] *See Boilermakers*, 73 A.3d at 952.

[103] *See id.*

Section 11 claim,] a Section 10(b) plaintiff . . . . must prove that the defendant acted with scienter . . . .[104]

A plaintiff asserting a violation of the 1933 Act need only contend either that (i) the registration statement or prospectus contained a material misstatement or omission (Sections 11 & 12(a)(2))[105] or (ii) the issuer "wrongful[ly] fail[ed] to register securities before offering them for sale" (Section 12(a)(1)).[106] The distinct nature of a claim based on a defective registration statement demonstrates its external status.

The identity of the possible defendants for a 1933 Act claim further demonstrates that the claim is not internal to the corporation. Under Section 11 of the 1933 Act, a plaintiff may sue:

- "every person who signed the registration statement";

- "every person who was a director of (or person performing similar functions) or partner of the issuer at the time of the filing of the part of the registration statement with respect to which his liability is asserted";

- "every person who, with his consent, is named in the registration statement as being or about to become a director, person performing similar functions, or partner";

- "every accountant, engineer, appraiser, or any person whose profession gives authority to a statement made by him, who has with his consent been named as having prepared or certified any part of the registration statement, or as having prepared or certified any report which is used in connection with the registration statement, with respect to the statement in such registration

---

[104] *Huddleston*, 459 U.S. at 382 (citation and footnote omitted).

[105] *See Gustafson*, 513 U.S. at 571.

[106] *See Pinter*, 486 U.S. at 638.

35

statement, report, or valuation, which purports to have been prepared or certified by him"; and

- "every underwriter with respect to such security."[107]

Director status is not required. Officer status is not required. An internal role with the corporation is not required.

The definition of a "security" underscores the absence of any meaningful connection between a 1933 Act claim and stockholder status. A share of stock can be a "security," but the 1933 Act defines that term far more broadly:

> The term "security" means any note, stock, treasury stock, security future, security-based swap, bond, debenture, evidence of indebtedness, certificate of interest or participation in any profit-sharing agreement, collateral-trust certificate, preorganization certificate or subscription, transferable share, investment contract, voting-trust certificate, certificate of deposit for a security, fractional undivided interest in oil, gas, or other mineral rights, any put, call, straddle, option, or privilege on any security, certificate of deposit, or group or index of securities (including any interest therein or based on the value thereof), or any put, call, straddle, option, or privilege entered into on a national securities exchange relating to foreign currency, or, in general, any interest or instrument commonly known as a "security", or any certificate of interest or participation in, temporary or interim certificate for, receipt for, guarantee of, or warrant or right to subscribe to or purchase, any of the foregoing.[108]

Depending on how one counts the cross-referenced categories, this definition could identify as few as fifty or as many as 369 different types of securities. Shares are just one of these many types of securities, and shares of a Delaware corporation are only one subset of that one type. There is no necessary connection between a 1933 Act claim and the shares

---

[107] 15 U.S.C. § 77k(a).

[108] 15 U.S.C. § 77b(a)(1).

of a Delaware corporation.

Finally, even when the investor does purchase a share of stock (as opposed to a different kind of security), the predicate act is the purchase.[109] The cause of action does not arise out of or relate to the ownership of the share, but rather from the purchase of the share. At the moment the predicate act of purchasing occurs, the purchaser is not yet a stockholder and does not yet have any relationship with the corporation that is governed by Delaware corporate law. Nor must the purchaser continue to own the security to be able to assert a claim under the 1933 Act: the plaintiff can sue even if it subsequently sells and is no longer a stockholder.[110]

For purposes of the analysis in *Boilermakers*, a 1933 Act claim resembles a tort or contract claim brought by a third-party plaintiff who was not a stockholder at the time the claim arose. At best for the defendants, a 1933 Act claim resembles a tort or contract claim brought by a plaintiff who happens also to be a stockholder, but under circumstances where stockholder status is incidental to the claim. A 1933 Act claim is an external claim that falls

---

[109] *See Blue Chip Stamps v. Manor Drug Stores*, 421 U.S. 723, 752 (1975) ("[T]he 1934 Act . . . is general in scope but chiefly concerned with the regulation of post-distribution trading on the Nation's stock exchanges and securities trading markets. The 1933 Act is a far narrower statute chiefly concerned with disclosure and fraud in connection with offerings of securities—primarily . . . initial distributions of newly issued stock from corporate issuers.").

[110] *See* 15 U.S.C. § 77k(e) ("The suit authorized under [Section 11] may be to recover such damages as shall represent the difference between the amount paid for the security (not exceeding the price at which the security was offered to the public) and (1) the value thereof as of the time such suit was brought, or (2) *the price at which such security shall have been disposed of in the market before suit . . . .*" (emphasis added)).

outside the scope of the corporate contract.

Under existing Delaware authority, a Delaware corporation does not have the power to adopt in its charter or bylaws a forum-selection provision that governs external claims. The Federal Forum Provisions purport to regulate the forum in which parties external to the corporation (purchasers of securities) can sue under a body of law external to the corporate contract (the 1933 Act). They cannot accomplish that feat, rendering the provisions ineffective.

**B.      First Principles Indicate That The Federal Forum Provisions Are Ineffective.**

As discussed in the preceding section, the seminal *Boilermakers* decision and other extant authorities indicate that a Delaware corporation cannot use its charter or bylaws to regulate the forum in which parties bring external claims, such as federal securities law claims. The defendants argue that these authorities are distinguishable because they do not speak to the Federal Forum Provisions, which present an issue of first impression. The same result derives from first principles.

The defendants ask the court to start with the plain language of Section 102(b)(1), and they argue that its phrasing is broad enough to encompass a Federal Forum Provision. But reasoning from first principles requires more fundamental starting points: the concept of the corporation and the nature of its constitutive documents.

For purposes of Delaware law, a corporation is a legal entity—a "body corporate"—

38

created through the sovereign power of the state.[111] Although the promulgation of general incorporation statutes like the DGCL has reduced the visibility of the state's role by eliminating the need for special legislation, the issuance of a corporate charter remains a sovereign act.[112] When an incorporator files a certificate of incorporation that complies with the requirements of the DGCL, the acceptance of the filing by the Delaware Secretary of State gives rise to an artificial entity having attributes that only the state can bestow, such as separate legal existence,[113] presumptively perpetual life,[114] and limited liability for its investors.[115]

---

[111] 8 *Del. C.* § 106 ("Upon the filing with the Secretary of State of the certificate of incorporation, executed and acknowledged in accordance with § 103 of this title, the incorporator or incorporators who signed the certificate, and such incorporator's or incorporators' successors and assigns, shall, from the date of such filing, be and constitute a body corporate . . . .").

[112] *See* Del. Const. art. IX, § 1 ("No corporation shall hereafter be created, amended, renewed or revived by special act, but only by or under general law, nor shall any existing corporate charter be amended, renewed or revived by special act, but only by or under general law; but the foregoing provisions shall not apply to municipal corporations, banks or corporations for charitable, penal, reformatory, or educational purposes, sustained in whole or in part by the State. . . .").

[113] 8 *Del. C.* § 106.

[114] 8 *Del. C.* § 102(b)(5) (authorizing the certificate of incorporation to contain "[a] provision limiting the duration of the corporation's existence to a specified date; otherwise, the corporation shall have perpetual existence"); 8 *Del. C.* § 122(1) ("Every corporation created under this chapter shall have power to: (1) Have perpetual succession by its corporate name, unless a limited period of duration is stated in its certificate of incorporation . . . .").

[115] 8 *Del. C.* § 102(b)(6) (authorizing a provision in the certificate of incorporation to "impos[e] personal liability for the debts of the corporation on its stockholders . . .; otherwise, the stockholders of a corporation shall not be personally liable for the payment of the corporation's debts except as they may be liable by reason of their own conduct or

By virtue of Delaware's exercise of its sovereign authority, a Delaware corporation comes into existence and gains the power to act in the world. The DGCL defines what powers the corporation can exercise, identifying both general[116] and specific powers[117] that a Delaware corporation possesses. A Delaware corporation only can wield the powers that the DGCL provides.[118] When a corporation purports to take an action that it lacks the capacity or power to accomplish, that action is *ultra vires* and void.[119]

---

acts"); 8 *Del. C.* § 162(a) (authorizing liability of stockholder or subscriber only when consideration for shares of corporation has not been paid in full and the assets of the corporation are insufficient to satisfy its creditors; limiting liability to "the amount of the unpaid balance of the consideration for which such shares were issued").

[116] *See* 8 *Del. C.* § 121.

[117] *See* 8 *Del. C.* §§ 122–123.

[118] *Lawson v. Household Fin. Corp.*, 152 A. 723, 726 (Del. 1930); *accord Trustees of Dartmouth College v. Woodward*, 17 U.S. 518, 636 (1819) ("[A corporation] possesses only those properties which the charter of its creation confers upon it, either expressly, or as incidental to its very existence.").

[119] *See Carsanaro v. Bloodhound Techs., Inc.*, 65 A.3d 618, 648–54 (Del. Ch. 2013) (discussing the largely outdated concept of "capacity or power" and its relationship to the *ultra vires* doctrine), *abrogated on other grounds by El Paso Pipeline GP Co., L.L.C. v. Brinckerhoff*, 152 A.3d 1248, 1264 (Del. 2016) (rejecting *Carsanaro*'s analysis of post-merger derivative standing). The *ultra vires* doctrine is largely a relic of the past because the DGCL retains only three limitations on corporate capacity or power. *See* 1 R. Franklin Balotti & Jesse A. Finkelstein, *The Delaware Law of Corporations and Business Organizations* §§ 2.4–2.6 (3d ed. 1997 & Supp. 2013). First, with specified exceptions, no corporation formed under the DGCL after April 18, 1945, may confer academic or honorary degrees. 8 *Del. C.* § 125. Second, no corporation formed under the DGCL can exercise banking power. 8 *Del. C.* § 126(a). Third, a Delaware corporation that is designated as a private foundation under the Internal Revenue Code must comply with certain tax provisions, unless its charter provides that the restriction is inapplicable. 8 *Del. C.* § 127. A corporation nevertheless retains the ability to impose limitations on (and create uncertainty about) its capacity or power by including provisions in its charter that forbid it

The contract that gives rise to the artificial entity and confers these powers is not an ordinary private contract among private actors.[120] The certificate of incorporation is a multi-party contract that includes the State of Delaware.[121] Unlike an ordinary contract, a certificate of incorporation always incorporates by reference the limitations imposed by the DGCL.[122] Unlike an ordinary contract, a certificate of incorporation can only be amended

---

from entering into particular lines of business or engaging in particular acts. *See* Balotti & Finkelstein, *supra*, § 2.1.

[120] *See* Hershkoff & Kahan, *supra*, at 277–85. As mentioned in the introduction, this decision uses the term "ordinary contract" to refer to a purely private contract between purely private parties, in which the signatories allocate their rights and obligations. Such a contract is governed by the principles set out in the *Restatement (Second) of Contracts*, including requirements for contract formation that include an offer, acceptance, consideration, and a meeting of the minds on material terms. *See* Lipton, *supra*, at 586 n.14 (using this definition).

[121] *STARR Surgical Co. v. Waggoner*, 588 A.2d 1130, 1136 (Del. 1991) ("[A] corporate charter is both a contract between the State and the corporation, and the corporation and its shareholders."); *Lawson*, 152 A. at 727 ("[T]he charter of a corporation is a contract both between the corporation and the state and the corporation and its stockholders. It is not necessary to cite authorities to support this proposition."); *see* Hershkoff & Kahan, *supra*, at 277 ("A corporation's charter and bylaws, however, are no ordinary contracts. They are instead a hybrid between an ordinary contract and state law— they are highly regulated constitutive documents that order collective decision-making.").

[122] 8 *Del. C.* § 121(b) ("Every corporation shall be governed by the provisions and be subject to the restricts and liabilities contained in this chapter."); 8 *Del. C.* § 394 ("This chapter and all amendments thereof shall be a part of the charter or certificate of incorporation of every corporation except so far as the same are inapplicable and inappropriate to the objects of the corporation."); *see STARR Surgical*, 588 A.2d at 1136 ("[I]t is a basic concept that the General Corporation Law is a part of the certificate of incorporation of every Delaware company."); *Fed. United Corp. v. Havender*, 11 A.2d 331, 333 (Del. 1940) ("It is elementary that [the Delaware General Corporation Law's] provisions are written into every corporate charter.").

in compliance with the DGCL.[123] Unlike an ordinary contract, a certificate of incorporation may only contain provisions authorized by the DGCL.[124] Although courts enforce both types of contracts, they deploy different principles, with courts enforcing the relationships created by the corporate contract using an overlay of fiduciary duty.[125]

Because the state of incorporation creates the corporation, the state has the power through its corporation law to regulate the corporation's internal affairs.[126] For example, the certificate of incorporation can specify the rights, powers, and privileges of shares of stock, thereby specifying contractual rights that accompany those shares.[127] It can specify

---

[123] *See* 8 *Del. C.* §§ 241–242.

[124] *See Berlin v. Emerald P'rs*, 552 A.2d 482, 488 (Del. 1988) ("In examining the provisions of a certificate of incorporation, courts apply the rules of contract interpretation. . . . Nevertheless, the contract rights of the stockholders of the corporation are also subject to the provisions of the Delaware General Corporation Law."); *see also Boilermakers*, 73 A.3d at 940 ("[O]ur Supreme Court has long noted that bylaws, together with the certificate of incorporation and the broader DGCL, form part of a flexible contract between corporations and stockholders . . . ."); *In re Activision Blizzard, Inc. S'holder Litig.*, 124 A.3d 1025, 1050 & n.11 (Del. Ch. 2015) (collecting authorities).

[125] *See, e.g.*, *Stone ex rel. AmSouth Bancorporation v. Ritter,* 911 A.2d 362, 370 (Del. 2006) (explaining that directors owe duties of care and loyalty and that the duty of loyalty includes "a requirement to act in good faith"); *Mills Acq. Co. v. Macmillan, Inc.*, 559 A.2d 1261, 1280 (Del. 1989) ("[D]irectors owe fiduciary duties of care and loyalty to the corporation and its shareholders."); *Polk v. Good*, 507 A.2d 531, 536 (Del. 1986) ("In performing their duties the directors owe fundamental fiduciary duties of loyalty and care to the corporation and its shareholders.").

[126] *See generally* Jack B. Jacobs, *The Reach of State Corporation Law Beyond State Borders: Reflections Upon Federalism*, 84 N.Y.U. L. Rev. 1149 (2009).

[127] 8 *Del. C.* §§ 102(a)(4), 151(a).

the composition and structure of the board of directors[128] and what powers the board can exercise.[129] When taking these actions, Delaware deploys the corporate law to determine the parameters of the property rights that the state has chosen to establish.

The power of the state of incorporation to address these matters manifests itself through the internal-affairs doctrine. No matter where the corporation conducts its operations or locates its headquarters, the law of the state of incorporation governs the entity's internal affairs.[130] The corporation's contacts with the forum state do not affect the choice-of-law analysis because the questions are internal to the corporation.[131]

---

[128] *See* 8 *Del. C.* § 141(b), (d) & (f).

[129] *See* 8 *Del. C.* § 141(a) ("The business and affairs of every corporation organized under this chapter shall be managed by or under the direction of a board of directors, except as may be otherwise provided in this chapter or in its certificate of incorporation. If any such provision is made in the certificate of incorporation, the powers and duties conferred or imposed upon the board of directors by this chapter shall be exercised or performed to such extent and by such person or persons as shall be provided in the certificate of incorporation.").

[130] *McDermott Inc. v. Lewis*, 531 A.2d 206, 215 (Del. 1987) ("The internal affairs doctrine requires that the law of the state of incorporation should determine issues relating to internal corporate affairs."); *accord Sagarra Inversiones, S.L. v. Cementos Portland Valderrivas, S.A.*, 34 A.3d 1074, 1081 (Del. 2011) ("The term 'internal affairs' encompasses 'those matters that pertain to the relationships among or between the corporation and its officers, directors, and shareholders.' The [internal affairs] doctrine requires that the law of the state (or, in this case, the sovereign nation) of incorporation must govern those relationships." (footnote omitted)); *VantagePoint Venture P'rs 1996 v. Examen, Inc.*, 871 A.2d 1108, 1116 (Del. 2005) ("[W]e hold Delaware's well-established choice of law rules and the federal constitution mandated that Examen's internals, and in particular, VantagePoint's voting rights, be adjudicated exclusively in accordance with the law of its state of incorporation, in this case, the law of Delaware." (footnotes omitted)).

[131] *McDermott*, 531 A.2d at 214–15 ("Corporations and individuals alike enter into contracts, commit torts, and deal in personal and real property. Choice of law decisions

But the state of incorporation cannot use corporate law to regulate the corporation's external relationships. Jurisdictions invariably enact laws addressing unfair competition, employment relationships, health and welfare standards, and numerous other issues that affect a corporation's business. When states regulate these activities, they exercise authority over actors and activities within their territorial jurisdictions (or which have a sufficient nexus with their territorial jurisdictions).[132] State "blue sky" statutes, for example, extend only to securities that are offered for sale or purchased within the state.[133]

---

relating to such corporate activities are usually determined after consideration of the facts of each transaction. . . . The internal affairs doctrine has no applicability to these situations. Rather, this doctrine governs the choice of law determinations involving matters *peculiar* to corporations, that is, those activities concerning the relationships *inter se* of the corporation, its directors, officers and shareholders.").

[132] *See Singer v. Magnavox Co.*, 380 A.2d 969, 981 (Del. 1977) (discussing the "presumption that a law is not intended to apply outside the territorial jurisdiction of the State in which it is enacted"), *overruled on other grounds by Weinberger v. UOP, Inc.*, 457 A.2d 701 (Del. 1983); *Ward v. CareFusion Solutions, LLC*, 2018 WL 1320225, at *2–3 (Del. Super. Mar. 13, 2018) (interpreting California Labor Code as only applying within California); *Marshall v. Priceline.com Inc.*, 2006 WL 3175318, at *2 (Del. Super. Oct. 31, 2006) (holding that Delaware Consumer Fraud Act does not have extraterritorial effect); *Carter v. Dep't of Public Safety*, 290 A.2d 652, 655 (Del. Super. 1972) (declining to interpret Delaware statute requiring the forwarding of convictions to the Delaware Division of Motor Vehicles as having extraterritorial effect).

[133] *See Singer*, 380 A.2d at 981–82 (holding that the Delaware Securities Act is a commercial statute that applies to certain purchases or sales of securities with a "sufficient nexus" with Delaware, and that the statute did not apply simply because the issuer was a Delaware corporation, nor because the vote on the merger that resulted in the issuance took place in Delaware); *FdG Logistics LLC v. A&R Logistics Hldgs.*, 131 A.3d 842, 846 (Del. 2016) (rejecting interpretation of choice-of-law clause that "would lead to the bizarre result of converting a blue-sky statute that the Legislature intended to regulate *intrastate* securities transactions into one that would regulate *interstate* securities transactions"); Lipton, *supra*, at 598 ("Unlike corporate governance (and to the extent not preempted by

44

When determining what law governs state securities law claims, state courts apply territorial principles; they "do not look to the terms of the corporate charter of the law of the state of incorporation . . . ."[134]

Without more, the corporate contract does not enable Delaware to regulate the activities of parties that are beyond its territorial jurisdiction. Delaware can regulate the internal affairs of its corporate creations, regardless of their location, but only their internal affairs. While serving on this court, Chief Justice Strine articulated the resulting distinction between what Delaware can regulate using its corporate law and what it cannot:

> Delaware's corporation law is not what, in a European context, might be called a broad-based company law. Aspects of company law like competition law, labor law, trade, and requirements for the filing of regular disclosures to public investors, are not part of Delaware's corporation law. . . . Delaware corporation law governs only the internal affairs of the corporation. In that sense, our law is a specialized form of contract law that governs the relationship between corporate managers—the directors and officers—of corporations, and the stockholders.[135]

Put self-referentially, the corporate contract can only regulate claims involving the corporate contract. It cannot regulate external activities, nor the behavior of parties in other capacities.

In light of these principles, "there is no reason to believe that corporate governance

---

federal law), states regulate the offers, sales, and purchases of securities on a territorial basis.").

[134] Lipton, *supra*, at 598; *accord Singer*, 380 A.2d at 981–82.

[135] Leo E. Strine, Jr., *The Delaware Way: How We Do Corporate Law and Some of the New Challenges We (and Europe) Face*, 30 Del. J. Corp. L. 673, 674 (2005).

documents, regulated by the law of the state of incorporation, can dictate mechanisms for bringing claims that do not concern corporate internal affairs, such as claims alleging fraud in connection with a securities sale."[136] The state cannot assert authority over other types of claims based on the corporate contract, because the claims do not arise out of internal corporate relationships, and the fact of incorporation is not a sufficient nexus to support applying the chartering state's law to external claims.[137]

These first principles establish the framework within which Section 102 of the DGCL operates. Titled "Contents of certificate of incorporation," it specifies information that the charter must contain and identifies provisions that the charter may contain.[138] Section 102(a) identifies the mandatory information.[139] Section 102(b) identifies the optional provisions.[140] Perhaps the most well-known option is Section 102(b)(7), which

[136] Lipton, *supra*, at 598.

[137] *See Singer*, 380 A.2d at 981–82 (holding that fact of Delaware incorporation was not a sufficient nexus to warrant application of Delaware Securities Act to issuance of shares in connection with merger); *Marshall*, 2006 WL 3175318, at *2 ("[W]hile incorporation may be enough to allow Delaware law to apply to a dispute, it is not enough to allow the [Delaware Consumer Fraud Act] to apply to fraudulent transactions which did not occur in Delaware.").

[138] 8 *Del. C.* § 102.

[139] 8 *Del. C.* § 102(a) ("The certificate of incorporation shall set forth . . . .").

[140] *See* 8 *Del. C.* § 102(b) ("In addition to the matters required to be set forth in the certificate of information by subsection (a) of this section, the certificate of incorporation may also contain any or all of the following matters . . . ."); 1 Drexler, *supra*, § 6.02, at 6-8 ("While Section 102(a) lists the matters which must be covered in the certificate of a Delaware corporation, Section 102(b) identifies certain optional provisions which may be included in the certificate."); *accord* 1 Balotti & Finkelstein, *supra*, § 1.3, at 1-5 n.18 ("[Sections] 102(a) and (b) provide an outline of the provisions that must be included in

permits a corporation to exculpate directors from liability for breach of the fiduciary duty of care.[141]

Section 102(b)(1) provides general authority for the charter to contain non-mandatory provisions.[142] Leading Delaware commentators describe it as "an all-purpose provision which grants authority for a broad variety of charter provisions dealing with corporate management and the relations of stockholders *inter sese*."[143] Notably, they regard it as dealing with the internal affairs of the corporation. They do not mention Section 102(b)(1) authorizing the certificate of incorporation to regulate the rights that external

every charter, Section 102(a), and a listing of the subjects that may be included in the charter, Section 102(b).").

[141] *See* 8 *Del. C.* § 102(b)(7) (permitting exculpation from liability except for (i) any breach of the director's duty of loyalty; (ii) an act or omission not in good faith or involving intentional misconduct or a knowing violation of law; (iii) an unlawful dividend or stock repurchase under Section 174; and (iv) any transaction from which the director derived an improper personal benefit); *Stone*, 911 A.2d at 367 (explaining that a Section 102(b)(7) provision "can exculpate directors from monetary liability for a breach of the duty of care, but not for conduct that is not in good faith or a breach of the duty of loyalty" (footnote omitted)); 1 Drexler, *supra*, § 6.02[7], at 6-18 ("The totality of these limitations or exemptions . . . is to eliminate . . . director liability only for 'duty of care' violations."). The presence of an exculpatory provision does not eliminate the underlying duty of care or the potential for fiduciaries to breach that duty. *See Malpiede v. Townson*, 780 A.2d 1075, 1095 n.68 (Del. 2001); *In re Walt Disney Co. Deriv. Litig.*, 907 A.2d 693, 752 (Del. Ch. 2005), *aff'd*, 906 A.2d 27 (Del. 2006). Consequently, "[t]he duty of care continues to have vitality in remedial contexts as opposed to actions for personal monetary damages against directors as individuals." E. Norman Veasey et al., *Delaware Supports Directors With a Three–Legged Stool of Limited Liability, Indemnification, and Insurance*, 42 Bus. Law. 399, 403 (1987).

[142] 8 *Del. C.* § 102(b)(1).

[143] 1 Drexler, *supra*, § 6.02[1], at 6-8.

actors might have against the corporation.

In an effort to expand the reach of the DGCL and the scope of Section 102(b)(1), the defendants cite cases that discuss Delaware's support for private ordering, but each of these cases focuses on the internal affairs of Delaware corporations, not external issues.[144] Consistent with the scope of what Delaware can regulate through the DGCL, Section 102(b)(1) only provides authority for the charter to govern internal claims.

As discussed at length in the previous section, a federal claim under the 1933 Act is a clear example of an external claim. The plaintiff is a purchaser of securities, and the source of the cause of action is the sale of a security that violates the federal regulatory regime. The defendants need not be directors or officers of the corporation; they can be anyone that the 1933 Act identifies as a viable defendant. The fact that the plaintiff might

---

[144] *See Jones Apparel Gp. v. Maxwell Shoe Co.*, 883 A.2d 837, 845 (Del. Ch. 2004) (Strine, V.C.) ("As Professor Folk noted in his comments on the 1969 amendments to the DGCL, and particularly on the enabling feature of § 141(a), 'the Delaware corporation enjoys the broadest grant of power in the English-speaking world to establish the most appropriate *internal organization and structure* for the enterprise.'" (emphasis added)); *Sagusa, Inc. v. Magellan Petroleum Corp.*, 1993 WL 512487, at *2 (Del. Ch. Dec. 1, 1993) ("[T]he public policy applicable to Delaware's corporation law is expressed in 8 *Del. C.* § 102(b)(1), which authorizes companies to include in their charters any *corporate governance provisions* that do not violate Delaware law." (emphasis added)); *Frankel v. Donovan*, 120 A.2d 311, 316 (Del. Ch. 1956) ("Charter provisions *which facilitate corporate action* and to which a stockholder assents by becoming a stockholder are normally upheld by the court unless they contravene a principle implicit in statutory or settled decisional law governing corporate management." (emphasis added) (citations omitted)); *see also Sterling v. Mayflower Hotel Corp.*, 93 A.2d 107, 118 (Del. 1952) (upholding validity of charter provision permitting interested directors to be counted for quorum purposes because it "relat[ed] to the powers of the directors in *conducting the corporate business*" (emphasis added)).

have purchased shares in a Delaware corporation is incidental to the claim; shares are but one type of security covered by the 1933 Act. Even if the purchase did involve shares, the event giving rise to the claim takes place just before the plaintiff becomes a stockholder, before the corporate contract applies. Nor is continuing stockholder status necessary to assert a 1933 Act claim: the plaintiff can sue even if it sells and is no longer a stockholder. The federal claim does not invoke the stockholder's legal or equitable rights under the state law corporate contract.

Despite this array of distinctions, the defendants have argued that issuing securities and defending against securities lawsuits involve the business and affairs of the corporation. That is true, but it does not follow that these matters involve the *internal affairs* of the corporation. Many aspects of the corporation's business and affairs involve external relationships. The certificate of incorporation and Delaware law cannot regulate those external relationships.

The defendants have also argued that a claim under the 1933 Act involves internal corporate relationships because a Section 11 claim seeks to hold corporate officials accountable for the content of registration statements. That is also true, but the claim remains external to the corporate contract.

Reasoning from first principles generates the same result as applying *Boilermakers*. The nominal defendants lack authority to use their certificates of incorporation to regulate claims under the 1933 Act. The Federal Forum Provisions are ineffective and invalid.

## C.     Other Arguments

The plaintiff argues alternatively that the Federal Forum Provisions are invalid

49

because they "transgress . . . a public policy settled by the common law or implicit in the General Corporation Law itself."[145] He observes that the Federal Forum Provisions take Delaware out of its traditional lane of corporate governance and into the federal lane of securities regulation.[146] The extent of the infringement in this case might not seem significant (excluding one of two forums that federal law permits), but the implications would be vast (asserting that state corporate law could be used to regulate federal claims). The Federal Forum Provisions would thus violate Delaware public policy and be invalid.

There are also grounds to believe that because the Federal Forum Provisions conflict with the forum alternatives that the 1933 Act permits, the provisions could be preempted.[147]

---

[145] *Sterling*, 93 A.2d at 118; *see Jones Apparel*, 883 A.2d at 848 ("[T]he court must determine, based on a careful, context-specific review in keeping with *Sterling*, whether a particular certificate provision contravenes Delaware public policy, i.e., our law, whether it be in the form of statutory or common law.").

[146] *See, e.g.*, Myron T. Steele, *Sarbanes-Oxley: The Delaware Perspective*, 52 N.Y.L. Sch. L. Rev. 503, 506–07 (2008) ("[T]he focus of the federal lane has always been, and should always be, market fraud and disclosure. On the other hand, monitoring the structure of internal corporate governance is the focus of the state lane.").

[147] *See* Hamermesh & Monhait, *supra* ("[A] state authorization of charter and bylaw provisions purporting to control fee-shifting and venue in federal securities class action is likely to be held pre-empted, regardless of their validity or effect under state law."); *cf.* John C. Coffee, Jr., *"Loser Pays": The Latest Installment in the Battle-Scarred, Cliff-Hanging Survival of the Rule 10b-5 Class Action*, 68 SMU L. Rev. 689, 696–701 (2015) (discussing preemption doctrines in the context of conflict between fee-shifting bylaws and provisions of the federal securities laws); William K. Sjostrom, Jr., *The Intersection of Fee-Shifting Bylaws and Securities Fraud Litigation*, 93 Wash. U. L. Rev. 379, 405–14 (2015) (same).

This decision has not reached these additional arguments.

## D.     Blue Apron's Ripeness Argument

Blue Apron (but not Stitch Fix or Roku) argues that its Federal Forum Provision is unripe for challenge. This is an interesting position, because multiple actions under the 1933 Act are pending against defendants affiliated with Blue Apron, including an action filed in state court that is stayed.[148] Even without the existence of these actions, the challenge to the Federal Forum Provision is ripe.

Section 111(a)(1) of the DGCL confers jurisdiction on the Court of Chancery to "determine the validity of the provisions of . . . [t]he certificate of incorporation . . . of a corporation . . . ."[149] Delaware's declaratory judgment statute permits a court "to declare rights, status and other legal relations whether or not further relief is or could be claimed."[150] The dispute must present an "actual controversy," which includes the requirement that it "be ripe for judicial determination."[151]

> Courts decline to render hypothetical opinions, that is, dependent on supposition, for two basic reasons. First, judicial resources are limited and must not be squandered on disagreements that have no significant current impact and may never ripen into legal action [appropriate for judicial resolution]. Second, to the extent that the judicial branch contributes to law creation in our legal system, it legitimately does so interstitially and because it is required to do so by reason of specific facts that necessitate a judicial

---

[148] *See* Dkt. 32, Ex. B (stipulation staying New York state court action pending resolution of motion to dismiss or settlement in the federal action).

[149] 8 *Del. C.* § 111(a)(1).

[150] 10 *Del. C.* § 6501.

[151] *Rollins Int'l, Inc. v. Int'l Hydronics Corp.*, 303 A.2d 660, 662–63 (Del. 1973).

judgment.[152]

Determining whether a case is ripe requires "a common sense assessment[.]"[153] "The reasons for not rendering a hypothetical opinion must be weighed against the benefits to be derived from the rendering of a declaratory judgment. This weighing process requires the exercise of judicial discretion which should turn importantly upon a practical evaluation of the circumstances of the case."[154] "Generally, a dispute will be deemed ripe if litigation sooner or later appears to be unavoidable and where the material facts are static."[155]

"Facial challenges to the legality of provisions in corporate instruments are regularly resolved by this Court."[156] The ripeness doctrine permits a court to postpone review until the disputed issue "arises in some more concrete and final form,"[157] but there is no point in doing so here. A facial challenge presents a pure question of law.[158] The material facts are

---

[152] *Stroud v. Milliken Enters.*, 552 A.2d 476, 480 (Del. 1989) (alteration in original) (internal quotation marks omitted).

[153] *XL Specialty Ins. Co. v. WMI Liquidating Tr.*, 93 A.3d 1208, 1217 (Del. 2014).

[154] *Stroud*, 552 A.2d at 480 (internal quotation marks omitted).

[155] *XL Specialty*, 93 A.3d at 1217 (internal quotation marks omitted).

[156] *Lions Gate Entm't Corp. v. Image Entm't Inc.*, 2006 WL 1668051, at *6 (Del. Ch. June 5, 2006); *accord Solak*, 153 A.3d at 737.

[157] *Stroud*, 552 A.2d at 480 (quoting *Continental Air Lines, Inc. v. C.A.B.*, 522 F.2d 107, 124–25 (D.C. Cir. 1974)); *see XL Specialty*, 93 A.3d at 1217–18 ("[A] dispute will be deemed not ripe where the claim is based on 'uncertain and contingent events that may not occur,' or where 'future events may obviate the need' for judicial intervention." (footnote omitted)).

[158] *Solak*, 153 A.3d at 740.

static, and litigation over the validity of the Federal Forum Provisions appears likely.[159] It would add nothing to the record to wait to see if Blue Apron relies on its Federal Forum Provision to move to dismiss a 1933 Act claim.

The current dispute is also ripe because the Federal Forum Provisions "have a substantial deterrent effect."[160] The Federal Forum Provisions should cause a plaintiff to think twice before filing a 1933 Act claim in state court, facing a motion to dismiss on jurisdictional grounds, and incurring the costs and delay that a plaintiff who filed in federal court would not have to bear. Few stockholders would pursue that course. Instead, plaintiffs will abide by its requirements, enabling the provision to evade review.[161]

Declining to review the Federal Forum Provisions could also encourage other corporations to adopt similar provisions to take advantage of their deterrent effect. As in other cases involving facial challenges, deciding "the basic legal questions presented" will provide "efficiency benefits to not only the defendants and their stockholders, but to other corporations and their investors."[162]

Under a common sense assessment, the challenge to Blue Apron's provision is ripe.

---

[159] *See* Dkt. 41, at 5–6 (plaintiff's counsel commenting that Blue Apron defendants can be expected to move to dismiss the state court action on forum selection grounds once stay is lifted).

[160] *Id.* at 737.

[161] *See id.*; *Strougo*, 111 A.3d at 595 & n.19.

[162] *Solak*, 153 A.3d at 738 (quoting *Boilermakers*, 73 A.3d at 938).

**E.        Blue Apron's Savings Clause Argument**

Blue Apron argues that its Federal Forum Provision should be upheld because it "will never operate contrary to Delaware law."[163] According to Blue Apron, its provision achieves this ideal state by requiring claims under the 1933 Act to be brought in federal court only "to the fullest extent permitted by law[.]"

Blue Apron's savings clause argument fails because there is no context in which Blue Apron's Federal Forum Provision could operate validly.[164] "For a savings clause to negate a facial challenge . . ., there logically must be something left in the challenged provision for the savings clause to save."[165] Under the reasoning set forth in this decision, the corporate contract cannot be used to regulate federal securities claims under the 1933 Act. As a result, there is no possibility that Blue Apron's Federal Forum Provision could comply with Delaware law. The savings clause does not save it.

## III.        CONCLUSION

Judgment is entered for the plaintiff. The defendants' motions for summary judgment are denied.

---

[163] Dkt. 19, ¶ 3.

[164] *See Solak*, 153 A.3d at 743 (rejecting similar argument based on savings clause because "the Fee-Shifting Bylaw is wholly invalid").

[165] *Id.*